UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JAI MORIN, | |
| Plaintiff, | |
| v. | Civil Action No. |
| HANNAFORD BROS. CO., LLC, | |
| Defendant. | |

COMPLAINT
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Jai Morin ("Morin"), by and through undersigned counsel, and complains against the Defendant, Hannaford Bros. Co., LLC ("Hannaford"), as follows:

SUMMARY

1.      Morin is a current Hannaford employee who is being subjected to ongoing disability discrimination and retaliation. Morin needs the reasonable accommodation of a modified work schedule in order to perform the essential functions of his job as Assistant Meat Manager. Morin has repeatedly requested a modified work schedule and has informed Hannaford that he believes that it is acting unlawfully by denying his request. Hannaford has repeatedly denied Morin's request and has required him instead to use intermittent family medical leave. Hannaford's discrimination and retaliation has resulted in adverse employment actions against Morin including fewer hours of work and less pay and Hannaford's failure to promote Morin to Meat Manager. In addition, Morin is losing family medical leave benefits that he may need in the future for his own or a family members' serious medical condition.

1

JURISDICTION AND PARTIES

2.      This action arises under  the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.,* the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.,* the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§831 *et seq.*, as enforced through the MHRA, and the Maine Family Medical Leave Requirement Act ("MFMLR"), 26 M.R.S. §§ 844 *et seq.*

3.      Morin is a United States citizen residing in Clinton, Maine.

4.      Hannaford is a Maine limited liability company.

5.      Hannaford is a supermarket chain based in Scarborough, Maine. It operates stores in New England and upstate New York including a store in Waterville, Maine.

6.      Hannaford has more than 500 employees.

7.      Hannaford had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

8.      Hannaford employed more than 50 employees within 75 miles of Morin's workplace at all times material to this case.

9.      Hannaford employed more than 15 employees at Morin's Waterville, Maine store at all times material to this case.

10.      This Court has subject matter jurisdiction over Morin's federal and state claims pursuant to 28 U.S.C. §§ 1331and 1367.

11.      On or about April 13, 2016, Morin filed a timely Complaint/Charge of Discrimination against Delhaize America alleging unlawful disability discrimination, retaliation, and whistleblower retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

12.     On or about September 14, 2016, Morin filed an Amended Complaint/Charge of Discrimination with the MHRC and EEOC adding Hannaford Bros. Co., LLC as an additional Respondent.

13.     On or about October 20, 2016, the MHRC issued Notices of Right to Sue with respect to Morin's state law claims.

14.     On or about December 12, 2016, the EEOC issued Notices of Right to Sue with respect to Morin's federal law claims.

15.     Morin has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

FACTUAL ALLEGATIONS

BACKGROUND

16.     Morin has worked for Hannaford for close to 20 years, starting in March 1997.

17.     Morin has been employed as the Assistant Meat Manager at Store No. 8229 in Waterville since July 29, 2013.

18.     Morin is a full time employee. He makes about $20 per hour and receives employer-paid health insurance and other benefits.

19.     About four years ago, Morin was diagnosed with Lyme disease.

20.     Morin takes medications to treat the disease but he still experiences symptoms including fatigue, dizziness and pain. Morin has sleep disturbances in that he does not sleep well and wakes up early, tired and sore.

21.     Morin has good days and bad days. On bad days, Morin is exhausted and dizzy at the end of a regular eight hour work day.

22.     Store No. 8229 in Waterville is open for business from 7 AM to 11 PM Monday through Saturday and from 7 AM to 9 PM on Sunday. The Meat Department is staffed from about 4 AM until 9 PM or 10 PM.

23.     The current Meat Manager is Travis Hustis.

24.     Hustis and Morin supervise eight or nine employees including Dan Knowlton, the former Meat Manager who retired and then returned to work as a part time Meat Cutter.

25.     Prior to October 2015, Morin was able to manage his disability and job duties without any need for reasonable accommodation and/or making a formal request for reasonable accommodation.

26.     For years, Morin was scheduled to start work between 4 and 6 AM, and scheduled to stop working between 12:30 and 2:30 PM.  He occasionally worked until 3 or 3:30 PM. On rare occasions he was scheduled to work until 7 PM. The former Meat Manager, Daniel Knowlton, started later in the day and ended his shifts at about 4 or 5 PM. Mr. Knowlton rarely worked until 7 PM either.

27.     Beginning in about October 2015, after Knowlton retired and was replaced by Travis Hustis, Morin started getting scheduled to work one evening shift ending at 7 PM on a more regular basis. Morin also started getting scheduled for more shifts that ended at 4 PM. At times the later shifts were scheduled on days that Hustis had off but not always.

SCHEDULE ADJUSTMENT REQUESTED AND DENIED

28.     Morin spoke to his physician, Richard J. Dubocq, M.D., about his fatigue and inability to function well by late afternoon on "bad" days.

4

29.     Dr. Dubocq determined that Morin needed a work schedule that regularly ended by 2:30 PM. That schedule would allow Morin to leave work on "bad" days before he was overcome with fatigue.

30.     On December 31, 2015, Morin submitted to the Human Resources (HR) Manager at Store 8229 a reasonable accommodation form completed by Dr. Dubocq. Dr. Dubocq confirmed that Morin has a disability (which is also a serious health condition) and that he is able to perform the essential functions of his job. Dr. Dubocq confirmed that Morin's limitation is the inability to function well later in the day on "bad" days. Dr. Dubocq stated that given the difficulty of predicting which days are "bad" and which are "good," the reasonable accommodation requested was a shift that finished by 2:30 PM on a regular basis.

31.     Before and while Morin's request for accommodation was being considered, Morin had to call in sick on days when he was scheduled to work a late shift.

32.     On January 6, 2016, Assistant Store Manager Penny Davis and Associate Relations Manager Ginny Moryan met with Morin and denied his request.

33.     The reason given by Ms. Davis was that Hannaford did not want to "set precedent."

34.     Ms. Davis said that the standard practice was for Managers to work one night a week just as Managers are supposed to work one Sunday per month.

35.     The alternatives offered by Ms. Davis were for Morin to (a) step down to part time meat cutter or (b) travel to different stores for part time work.

36.     On January 13, 2016, Morin wrote a letter to Moryan asking for reconsideration of the decision to deny his reasonable accommodation request. Morin stated that he did not think his schedule accommodation request would produce an undue burden because there were many

other associates that are capable of performing the tasks that Morin performs after 2:30 PM. Morin asked for an explanation as to why his request was an undue burden.

37.     Before he submitted the January 13 letter, Morin was left off the following week's schedule altogether. On January 16, 2016, after Morin submitted the letter, his name was hand-written onto the schedule.

38.     On the morning of Saturday, January 16, 2016, Morin was called into the office and given a letter addressed to Dr. Dubocq asking if a 9 AM to 7 PM daily schedule would work for Morin's needs.

39.     Dr. Dubocq had already explained that Morin was unable to function well at the end of the work day. Hannaford's proposal was completely opposite from Morin's disability-related needs.

40.     In a letter dated January 21, 2016, Dr. Dubocq told Hannaford that Morin's needs were still the same as described in the initial paperwork submitted on December 31, 2015.

41.     On January 28, 2016, Moryan called Dr. Dubocq for more information about why Morin needed a schedule modification.

42.     Dr. Dubocq tried to explain Morin's limitations in a way that a lay person could understand. Dr. Dubocq explained that later in the day, Morin may just "crash" or "retrograde," that he starts out good in the morning and then "runs out of gas." Dr. Dubocq compared the limitation to a cell phone that runs out of "juice" and stops functioning.

43.     Dr. Dubocq's explanation made no difference to Hannaford.

44.     On Thursday, February 4, 2016, Davis and Moryan met with Morin again and Davis gave Morin a final ultimatum.

45.     Davis told Morin that his only option was to take a part time position at another store in Waterville.

46.     When Morin asked if there were any other options, he was told that he could resign.

47.     A part time position with Hannaford guarantees no hours. A part time employee may work from zero to 28 hours per week. In addition, part time employees receive a lower rate of pay and fewer benefits than a full time Assistant Meat Manager.

48.     When Morin pushed back again about his options, he was told he could also get his doctor to change his restrictions so that Morin was available at any time.

49.     Morin put in for a leave of absence to consider his options.

50.     Morin was told that if he did not make a choice before February 17, 2016, he would be demoted to part time Meat Service Leader at the other Waterville store.

51.     For a four week period from January 9 to February 6, 2016, Morin was not scheduled for, and did not work, any shifts that ended after 2:30 PM. There was no harm to Hannaford's business interests during that time frame.

52.     Morin did not work between February 7 and February 19 while he was considering his options.

<u>REDUCED SCHEDULE FML[1] REQUESTED</u>

53.     On February 17, 2016, Morin submitted a request for reduced schedule FML with scheduled shifts ending by 2:30 PM for the next eight months beginning immediately.

54.      On Saturday, February 20, 2016 at 11 AM, Morin was informed that he was being placed back on the schedule starting the following day, a Sunday. He was scheduled to

---

[1] In this Complaint, "FML" refers to leave under the FMLA and MFMLR.

work an eight hour day from 8 AM to 4:30 PM. To accommodate his disability, Morin had to leave work early on unpaid FML so he worked just 6.25 hours.

55.     After Morin returned on February 20, 2016 and requested reduced schedule FMLA, Hannaford began to schedule Morin so that the majority of his shifts ended after 2:30 PM but told him that he could leave earlier if he was having a bad day.

56.     On May 4, 2016, after Morin filed a complaint/charge of discrimination with the MHRC and EEOC, Hannaford granted Morin intermittent (not reduced schedule) FML.

57.     Morin and Hannaford are both harmed by Hannaford's refusal to grant Morin a reduced scheduled FML rather than intermittent FML

58.     Morin and Hannaford are also both harmed by Hannaford's refusal to grant Morin a modified work schedule as a reasonable accommodation.

59.     Morin continues to work less than eight hours a day when he is scheduled to work after 2:30 PM and is too fatigued or dizzy to stay at work.

60.      When Morin is having a "good" day, he stays at work until his scheduled shift ends even if that is later than 2:30 PM. (Example: 5/21/16--scheduled out 4:30 PM, punched out 4:39 PM.)

61.     Morin also stays past 2:30 PM on "bad" days if it would be too burdensome on the crew for him to leave early.

62.     When Morin has stayed past 2:30PM on bad days it had a significant negative impact on his health which lasts for days.

63.     Hannaford is operating the Meat Department without knowing for certain when Morin will need to leave work before his scheduled shift ends.

64.     On December 7, 2016, Morin notified Moryan that being scheduled to work late shifts continues to be hard on him.

65.     Morin told Moryan that he has done his best to work the late shifts so as to not put his team in a bad position and leave them short-staffed.

66.     Morin told Moryan that it is troubling to him that Hannaford leaves his team short-staffed by scheduling Morin for late shifts knowing that Morin may not feel well enough to perform his job effectively.

67.     Morin reported to Moryan that Hannaford's actions were putting him at risk of getting hurt. He asked Hannaford again to reconsider and provide him with reduced schedule FML or the reasonable accommodation of a schedule adjustment with shifts ending by 2:30 PM.

68.     Morin's schedule for two weeks in a row prior to December 7, 2016 included 8 to 4:30 shifts which was actually leaving the department a little short in the morning.

69.     Morin reported this as yet another form of retaliation against him, making things harder on his health with no measurable positive gain to the department.

HANNAFORD'S RETAIL LEADERSHIP SCHEDULE IS NOT AN ESSENTIAL FUNCTION
OF THE ASSISTANT MEAT MANAGER JOB

70.     The Assistant Meat Manager is a working supervisor who performs meat cutter functions as well as directing and supervising the work of meat cutters and clerks and managing inventory and sales.

71.     The essential functions of the Assistant Meat Manager job are listed on Hannaford's written job description for Assistant Meat Manager.

72.     The Assistant Meat Manager job description is silent on the subject of work schedules.

73.     Hannaford generates plans every week with goals on every aspect of the business, including how many hours will be devoted to the supervision of Meat Department employees.

74.     These plans provide important information about how much time the Assistant Meat Manager spends on supervision and customer service.

75.     For example, during the week ending April 2, 2016, Hannaford planned to spend 3.45 hours that week on supervision. The actual hours spent were 3.5.

76.     Dividing those hours equally between the Meat Manager and Assistant Meat Manager, Morin spent 1.75 hours out of 40 actively supervising employees.

77.     That same week, Hannaford planned to spend 5.29 hours on customer service in the Meat Department. The actual hours spent were 5.36.

78.     Divided between 10 or 11 employees, each person including Morin spent less than half an hour per week on customer service.

79.     Hannaford is well aware that Meat Department employees spend very little time interacting with customers.

80.     When Davis told Morin that his request for a schedule adjustment as a reasonable accommodation was denied, she explained that the store did not want to "set precedent."

81.     Davis's explanation reflects a fundamental misunderstanding of the MHRA's and ADA's laws and regulations for reasonable accommodation.

82.     A reasonable accommodation is a change in the way a person with a disability performs his or her job to overcome the limitations of the disability.

83.     Reasonable accommodations include making changes in the rules, policies, and practices when accommodation is necessary to give a person with disability an equal employment opportunity.

84.     Granting a reasonable accommodation does not "set precedent."

85.     Any time a person asks for an accommodation, it may be approved or denied after an individualized assessment is made.

86.     In response to Morin's charge/complaint to the MHRC and EEOC, Hannaford asserted that it cannot accommodate Morin's schedule adjustment request because it conflicts with Hannaford's Retail Leadership Schedule, a policy that applies to Department (as well as Store) leaders.

87.     There are four guidelines: (1) Managers within a Department should not schedule the same day off; (2) Managers are expected to work a late shift (at least until 7 PM) each week; (3) Managers should work a minimum of one Sunday a month on a rotating basis; and (4) Managers should be scheduled during peak business hours daily.

88.     None of the guidelines constitutes an essential function of the Assistant Meat Manager's job.

*First guideline*

89.     The first of these guidelines is not strictly followed. There are times that Morin and Hustis are scheduled to take the same days off. It happens about once a month for various reasons. It also happens when Morin or Hustis take vacations.  This is true in other departments as well.

*Second guideline*

90.     The second of these guidelines (Managers must work until 7 PM at least once a week) was not followed in the Meat Department prior to October 2015.

91.     The second guideline is not always met by any of the Departments.

92.     Hannaford has asserted that the Assistant Store Manager counseled Knowlton, the former Meat Manager, about the need to schedule himself and Morin until 7 PM one night per week and that Knowlton disregarded her instructions. This merely demonstrates that the guideline was not followed, not that it is an essential function.

93.     Customer service has never suffered due to a lack of direct supervision by the Assistant Meat Manager.

94.     No subordinate has lacked support due to a lack of direct supervision.

95.     The guideline is also arbitrary. There is no requirement that a manager be scheduled to work, for example, when the department opens in the morning. Similarly, a manager does not need to be on duty between 7 PM and 11 PM. It is apparent that meat cutters and associates are expected to work for long periods of time without direct supervision.

*Third guideline*

96.     The third guideline (working a minimum of one Sunday a month on a rotating basis) is not an issue in this case but it helps illustrate Morin's leadership.  Morin worked 18 out of 30 Sundays between December 12, 2015 and July 10, 2016. If Morin had refused to work more than the minimum required, he would have worked only one-third that number of Sundays.

*Fourth guideline*

97.     The fourth guideline is that the Manager and Assistant Manager should be scheduled during peak business hours daily.

98.     Like the second guideline, this policy was not followed in the Meat Department prior to October 2015.

99.     This guideline is contrary to Morin's schedule adjustment request to have shifts that end by 2:30 PM only if one accepts Hannaford's argument that "peak business hours" are

from 3 PM and 6 PM. This may be true for some departments, like Front-End, where "business" is synonymous with customer service.

100.    "Peak business hours" in the Meat Department start before the store even opens.

101.    The Meat Department needs a conscientious, skilled, responsible leader (like Morin) to arrive early in the morning to prepare product, organize the department and have things ready to go when the store opens. A leader needs to ensure that outdated product is removed, that short coded product is monitored, and product is rotated.

102.    The time spent preparing the Meat Department for customers is equally or more important than being around in the afternoon to re-stock shelves and answer the occasional question from a customer.

103.    The guidelines set forth in the Retail Leadership Schedule do not meet the definition of an essential function for the Assistant Meat Manager position.

104.    The job of Assistant Manager does not exist so that the Assistant Manager can work during specific hours (between 3 PM and 6 PM every day and until 7 PM one night a week.)

105.    It is true that the store is open and that someone needs to perform job duties in the meat department during those hours but there are other qualified employees available. These include 8 or 9 meat cutters and associates (including one meat cutter who is a former Meat Manager), the current Meat Manager, and other Store Managers who could handle a customer complaint if one was made when a department manager was not present.

106.    The Retail Leadership Schedule policy itself indicates that adjustments to the standards can be made with the Director of Operations' approval.

107.    Upon information and belief, Morin's request for reasonable accommodation was never presented to the Director of Operations for review or approval.

MORIN NEEDS A SCHEDULE ADJUSTMENT BECAUSE OF HIS DISABILITY

108.    Hannaford has argued that Morin is not disabled because he allegedly goes hunting at night.

109.    Hannaford also alleges that the real reason Morin wants a schedule that ends at 2:30 PM is because he operates a game butchering business that opens at 3 PM.

110.    It is true that Morin has a seasonal business butchering deer and moose (and very occasionally a bear) that are killed during prescribed hunting seasons in the fall.

111.    Morin takes two weeks of vacation off from work at Hannaford every fall during the height of the season. Most of his vacation time is devoted to this business.

112.    Morin has ample assistance from two other highly skilled meat cutters as well as three or four other helpers.

113.    If and when Morin experiences the symptoms of his Lyme disease while his game butchering business is operating, he delegates work to others.

114.    It makes no sense that Morin would ask for a year-round modified schedule from Hannaford in order to butcher game for two or three months in the fall.

115.    It is a gross distortion of the truth for Hannaford to claim that Morin is not disabled because he is able "to hunt for coyotes at night and still report for work the next morning."

116.    Sleep disturbances are a symptom of Morin's disability.

117.    One night last winter, Morin had difficulty sleeping. He was awake and saw a coyote in his yard. Morin (legally) shot and killed the coyote through a window. Morin showed a picture of that coyote (along with a picture of a coyote shot by a friend) to Hustis.

118.    Hannaford has twisted this story in an effort to portray Morin as a fraud.

RETALIATION

119.    Morin has been subjected to retaliation in the form of verbal warnings, surveillance, unfavorable shifts, and other adverse terms and conditions of employment.

120.    The retaliation is due to Morin's request for a reasonable accommodation and for medical leave.

121.    The retaliation is also due to Morin's reports to Hannaford that he believes that Hannaford is violating the law by refusing to grant his request for a reasonable accommodation.

122.    Morin has been told not to punch in early, formerly a common practice, and told that managers were going to be watching him to be sure he does not punch in early.

123.    Morin has not been called in to cover for understaffing and work (such as inventory) that is needed and performed on early shifts.

124.    Morin has been denied training opportunities and career development opportunities since he requested reasonable accommodation.

125.    Morin received negative comments about his inability to work into the late afternoon and evening on his March 18, 2016 job performance appraisal.

126.    During the time frame from December 12, 2015 to February 17, 2016, Morin was scheduled to work shifts that ended after 2:30 PM about 30% of the time. During the time frame from February 20, 2016 to July 10, 2016, Morin was scheduled to work shifts that end after 2:30 PM about 50% of the time.

127.     Hannaford has punished and continues to punish Morin for requesting a schedule adjustment by scheduling Morin to work later shifts more often than before.

128.     Morin is kept under constant scrutiny to see if he is leaving work early. Managers ask where Morin is if Morin is not in sight. No other Manager or Assistant Manager is treated that way. Travis Hustis is late to work on a regular basis and nobody asks where he is.

129.     Morin spoke with Hustis on December 24 or 26, 2016. He mentioned to Hustis that since many associates took those days off that it would be fair if Morin and others who worked both days to get New Year's off.  Hustis said it was a good idea. On Thursday, December 29, 2016, Hustis told Morin that the schedule for the following week was done but not printed.  He told Morin that he only scheduled him for 39 hours and that if Morin wanted 40 hours he would have to come in early on New Year's Day.  The only conceivable reason for this was to attack and retaliate against Morin.

130.     On December 30, 2016 Morin was scheduled to work until 7 PM. Morin knew that his energy level was going to be poor because there was a snow storm and he had to clear snow. Morin asked Hustis for the day off if the store was slow. Hustis did not grant Morin's request. That day, Hustis showed up for work at 9:30 AM, 2.5 hours late and when he got there, he sent Dan Breton (another employee) home early. When Morin said that he wished that Hustis had given him the day off, Hustis just laughed. Morin had to leave work at 2:30 PM that day because, as expected, he did not feel well.

131.     Morin works almost every Sunday and, although he was told that he would have Saturdays off if he works Sundays, Morin still has few Saturdays off. In contrast to this, Hustis takes almost every Sunday off as does one of the meat cutters. The meat cutter takes Sundays off to run a football pool at a bar.

<u>FAILURE TO PROMOTE</u>

132.    In December 2016, Morin applied for the position of Meat Manager in the Hannaford store in Skowhegan, a position for which he is well qualified.

133.    Morin was interviewed for the job on January 3, 2017.

134.    Morin was asked questions from a script that was different than the standard questionnaire that is used by Hannaford. He was asked if he could do the job with or without accommodations.  He was also asked directly if he could work the hours set forth in the Retail Leadership Schedule which is another way of asking if Morin needs a reasonable accommodation. The question was asked in order to disqualify Morin from consideration for the job.

135.    On January 6, 2017, Morin was informed that he was not hired for the Meat Manager job in Skowhegan. Morin was told that the successful candidate was a person who was currently an evening operations manager who had meat training. Morin was told that this other person was hired because he was trained to be in charge of the store and would be willing to close the store at night.

136.    Upon information and belief, the successful candidate submitted an application after the deadline for applications had passed.

137.    Hannaford failed to hire Morin for the position because of his disability, in retaliation for his request and need for a reasonable accommodation, and in retaliation for his exercise of his rights under the FMLA/FMLR.

<u>SUMMARY</u>

138.    Morin has a disability as defined by the MHRA and ADA. His Lyme disease is not transitory or minor. It has lasted for four years and significantly impairs his physical health

and in an episodic fashion it substantially limits major life activities, particularly when viewed without mitigating measures such as medication. By way of example, without the medication therapy Morin would be substantially limited in the major life activities of working and sleeping.

139.    Hannaford's regards Morin as a person with a disability and Morin has a record of disability.

140.    Hannaford has and continues to violate Morin's rights under the MHRA and the ADA by refusing to provide Morin with a modified work schedule to accommodate the symptoms of his disability including sleep disturbances, fatigue, pain, and dizziness that on "bad" days grows worse as the day goes on.

141.    Providing Morin with a modified work schedule would not eliminate an essential function of his job.

142.    It would not be an undue burden for Hannaford to grant Morin's request for a modified work schedule. Morin worked the schedule that he needs for years and there were no negative consequences for Hannaford's business. It was only in the fall of 2015 when Hannaford started insisting that Morin work later in the day and one night per week that Morin had to formally request an accommodation.

143.    The accommodation requested by Morin should be granted because it is reasonable, does not eliminate an essential function of his job, and does not impose an undue burden on Hannaford.

144.    Hannaford has failed to provide Morin with a reasonable accommodation.

145.    Hannaford has retaliated against Morin for exercising his right to request reasonable accommodations under the ADA and MHRA.

146.     Morin's Lyme Disease is also a serious health condition for purposes of the FMLA and FMLR and Hannaford has acknowledged as much by approving his request for FML.

147.     Morin's Lyme Disease is a chronic condition as defined by the FML laws as it is an ongoing condition for which he receives treatment multiple times per year and an ongoing treatment and which causes episodic limitations and a need for a reduced schedule.

148.     Morin should not be forced to use FML to receive a work schedule that accommodates his disability-related scheduling needs.

149.     To the extent that Morin is required to use FML he should be given a reduced schedule rather than being scheduled for shifts he cannot work and then forced to request intermittent leave.

150.     Hannaford has retaliated against Morin for requesting medical leave under the FMLA and MFMLR.

151.     Hannaford has retaliated against Morin in violation of the WPA for reporting to Hannaford that he believes that Hannaford is violating the law by refusing to grant his request for a reasonable accommodation.

152.     Conduct on the part of Davis and Hustis toward Morin evidences their discriminatory and retaliatory animus.

153.     Hannaford knowingly and willfully violated Morin's rights under the ADA, MHRA, WPA, FMLA and MFMLR.

154.     Hannaford unlawfully discriminated and retaliated against Morin with malice or reckless indifference to his rights.

155.   As a result of Hannaford's unlawful discrimination and retaliation against Morin, he has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

156.   Morin has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and he will continue to suffer irreparable injury from his treatment by Hannaford unless and until Hannaford is enjoined by this court.

COUNT I: MHRA
UNLAWFUL DISCRIMINATION

157.   Paragraphs 1-156 are incorporated by reference.

158.   Hannaford's conduct constitutes unlawful disability discrimination against Morin in violation of the MHRA.

COUNT II: MHRA
FAILURE TO ACCOMMODATE

159.   Paragraphs 1-158 are incorporated by reference.

160.   Hannaford violated the MHRA by failing to provide Morin with a reasonable accommodation for his disability.

COUNT III: MHRA
UNLAWFUL RETALIATION

161.   Paragraphs 1-160 are incorporated by reference.

162.   Hannaford violated the MHRA by retaliating against Morin because he requested a reasonable accommodation for his disability.

COUNT IV: ADA
UNLAWFUL DISCRIMINATION

163.   Paragraphs 1-162 are incorporated by reference.

20

164.    Hannaford's conduct constitutes unlawful discrimination against Morin in violation of the ADA.

## COUNT V: ADA
## FAILURE TO ACCOMMODATE

165.    Paragraphs 1-164 are incorporated by reference.

166.    Hannaford violated the ADA by failing to provide Morin with a reasonable accommodation for his disability.

## COUNT VI: ADA
## UNLAWFUL RETALIATION

167.    Paragraphs 1-166 are incorporated by reference.

168.    Hannaford violated the ADA by retaliating against Morin because he requested a reasonable accommodation for his disability.

## COUNT VII: WPA
## UNLAWFUL RETALIATION

169.    Paragraphs 1-168 are incorporated by reference.

170.    Hannaford's conduct constitutes unlawful retaliation against Morin for engaging in protected activity under the WPA.

## COUNT XIII: FMLA

171.    Paragraphs 1-170 are incorporated by reference.

172.    Hannaford violated Morin's prescriptive and proscriptive rights under the FMLA.

## COUNT IX: MFMLR

173.    Paragraphs 1-172 are incorporated by reference.

174.    Hannaford violated Morin's prescriptive and proscriptive rights under the MFMLR.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.      Declare the conduct engaged in by Defendant to be in violation of his rights;

B.      Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C.      Order Defendant to provide Plaintiff with the schedule adjustment he requested as a reasonable accommodation under the MHRA and ADA;

D.      Order Defendant to reinstate to Plaintiff all hours of FMLA and FMLR protection to which he is entitled and to which he was unnecessarily required to use in connection with his needed schedule;

E.      Order Defendant to provide Plaintiff with the promotion for which he applied;

F.      Award equitable-relief for back pay, benefits and prejudgment interest;

G.      Award compensatory damages in an amount to be determined at trial;

H.      Award punitive damages in an amount to be determined at trial;

I.      Award liquidated damages in an amount to be determined at trial;

J.      Award nominal damages;

K.      Award attorney's fees, including legal expenses, and costs;

L.      Award prejudgment interest;

M.      Permanently enjoin Defendant from engaging in any discriminatory or retaliatory employment practices;

N.      Require Defendant's Chief Operating Officer to mail a letter to all employees in Maine notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

O.      Require that Defendant post a notice in all of its workplaces in Maine of the verdict and a copy of the Court's order for injunctive relief;

P.      Require that Defendant train all management level employees on the protections afforded by the MHRA, WPA, ADA and FMLA and MFMLR;

Q.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully denied him a reasonable accommodation and retaliated against him; and

R.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  February 7, 2017                    _/s/_Chad T. Hansen_____
                                            Chad T. Hansen

                                            Attorney for the Plaintiff

                                            MAINE EMPLOYEE RIGHTS GROUP
                                            92 Exchange Street 2nd floor
                                            Portland, Maine 04101
                                            Tel. (207) 874-0905
                                            Fax (207) 874-0343
                                            chansen@maineemployeerights.com