# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| JAI MORIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 1:17-CV-50-GZS |
| | ) | |
| HANNAFORD BROS. CO., LLC, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant's Motion for Summary Judgment (ECF No. 38). After carefully considering the record and the parties' briefing, the Court GRANTS IN PART and DENIES IN PART the Motion, for the reasons outlined below.

## I. LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. See Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Human Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (quotation marks omitted).

## II. FACTUAL BACKGROUND

Plaintiff Jai Morin has worked for Hannaford since March of 1997 and has been employed as the Assistant Meat Manager at Store No. 8229 in Waterville, Maine (the "Elm Plaza store") since 2013. Several years before the events directly at issue in this matter, Morin was diagnosed with chronic Lyme disease, a condition Morin asserts is his disability. Morin takes medication to treat the disease but still experiences symptoms including fatigue, dizziness, and pain. On days when he experiences symptoms, he may experience severe fatigue and pain that worsens later in the day. When these symptoms escalate, they make him more prone to suffer a work-related injury and less able to perform his job duties. There are some days when Morin does not experience severe fatigue or pain if he works past mid-afternoon. However, working late on those days can trigger a flare-up of his symptoms in the ensuing days; Morin's doctor refers to this as a "crash." (Dubocq Dep. (ECF No. 41-1), PageID # 1023.) Morin was approved for the use of Family and Medical Leave Act ("FMLA") leave in 2013 based on his Lyme disease but ultimately did not use the leave at that time. Morin had previously used FMLA leave in 2007 for another health condition and returned to work without any issues.

Approximately nine employees work in the meat department at the Elm Plaza store, including managers, meat cutters, and clerks or associates who perform basic cleaning and preparation tasks. In addition to the Assistant Meat Manager, the Meat Department Manager and the Service Leader manage employees in the department. The Assistant Meat Manager position description[1] lists the following under "Essential Job Functions":

1. Role model outstanding, friendly customer service and use skills and knowledge to offer solutions that meet or exceed customers' expectations.
2. Direct work flow of meat cutters and meat clerks.

---

[1] Although the official position description in the record names the position as "Assistant Meat Market Sales Manager" (see, e.g., ECF No. 29-3, PageID # 377), the Court follows the parties' lead in referring to it as the Assistant Meat Manager position.

3.  Ensure product produced meets company standards.
4.  Oversee the cutting room, cooler organization, and rotation of all products.
5.  Process administrative paperwork and maintain accurate department records.
6.  Order and maintain inventory control in order to maximize sales and limit shrink issues.
7.  Use good judgment in the delegation, assignment, and follow up required for efficient performance of the department.
8.  Maintain effectiveness of department's staffing, scheduling, and financial results.
9.  Perform meat cutter functions.
10. Wash, rinse, and sanitize equipment as outlined by company practices.
11. Supervise performance of all duties and responsibilities of meat associates.
12. Must be able to meet the physical requirements of the position, with or without accommodations.

(ECF No. 29-3, PageID # 377.)  This list of essential job functions does not include a work schedule or otherwise directly reference work hours.  The entire time Morin has served as Assistant Meat Manager at the Elm Plaza store, the listed essential job functions have been the same.  Morin believes that role modeling, training, and developing associates are the most important leadership traits of a manager.  As part of his managerial duties, when someone calls in sick and Morin is in charge, he assesses the needs of the department to determine whether to call another associate in to work or to redistribute work among present staff.

Hannaford's Retail Leadership Schedule, which was in place prior to the events at issue in this matter, states that its purpose is to ensure that "Store and Department leaders are scheduled appropriately to cover all business needs."  (ECF No. 32, PageID # 555.)  To that end, the policy provides in relevant part that assistant managers are expected to work one late shift (until at least 7 p.m.) each week and that assistant managers should be scheduled to work during peak business hours daily.  The policy further states that the result of the scheduling guidelines will be "[c]onsistent conditions . . . creating a maximization of sales."  (Id., PageID # 556.)

Prior to his retirement in September 2015, the meat department at the Elm Plaza store was managed by Dan Knowlton, who did not follow applicable scheduling policies, including the

Retail Leadership Schedule. In April 2015, Assistant Store Manager Penny Davis[2] coached Knowlton to follow the scheduling policy for himself and Morin and that his failure to do so would result in discipline. Davis also coached Knowlton's successor, Travis Hustus, on similar issues. Morin recalls having discussions with Davis about the expectation that managers work one night per week until 7 p.m. However, from the time that he became Assistant Meat Manager to September or October 2015, Morin was regularly scheduled to finish work at 1:30 or 2:30 p.m. on most days. Morin was rarely scheduled to work past 3:30 p.m. prior to October 2015. In fact, during the time period between the weeks of January 4, 2014, and September 26, 2015, Morin was scheduled to work past 3:30 p.m. on only 14 days and until 7 p.m. on only five days. From 2013 to 2015, Morin received positive performance evaluations and four bonuses for his performance as Assistant Meat Manager.

One metric for measuring how well the meat department functions is maintaining good levels of inventory and avoiding "shrink," which describes when the department has to throw out inventory because it was not purchased. The Elm Plaza store meat department was one of the best in its regional district of Hannaford stores in maintaining good levels of inventory while Knowlton was Department Manager. In general, according to the key metrics Hannaford uses to evaluate financial performance, the meat department performed better financially during the December 2013 –December 2014 and September 2014 – September 2015 timeframes than it did during the August 2016 – August 2017 timeframe.

After Knowlton's retirement in September 2015, Hustus became Meat Department Manager. Morin began to be scheduled to work later in the day than he had previously been scheduled, specifically, some days until 4 p.m. and other days until 7 p.m. On December 20, 2015,

_____

[2] The record reflects that Penny Davis was known as Penny Lord during some portion of the period at issue in this case.

Morin spoke to Virginia Moryan, the Associate Relations Manager in the Elm Plaza store, about his new schedule. Morin told her that he needed to work earlier shifts because of his medical condition. Moryan told him that he would probably need something in writing from his doctor to justify a change to his schedule and subsequently provided Morin with a form for his doctor to complete.

On or about December 31, 2015, Morin provided Moryan with the form as completed by his doctor, Richard Dubocq. On the form, Dr. Dubocq indicated that Morin has a disability that renders him unable to function well at the end of the work day. To accommodate the disability, Dr. Dubocq asked Hannaford to schedule Morin so that he finishes work by 2:30 p.m. every day. At the time, Morin regularly worked a full-time schedule of eight hours per day, five days per week, with a half hour for lunch. Therefore, to end his work day by 2:30 p.m. and maintain a full-time schedule, Morin would need to begin working at 6 a.m. or earlier, when some employees in the meat department begin working.

Linda Shute, the Associate Relations Specialist for the area in which the store was located, talked with store management about Morin's request, the essential functions of the job, scheduling expectations, and whether Morin's unavailability after 2:30 p.m. would create a hardship for the store. Store management believed that Morin's request was not a reasonable accommodation. Shute also discussed the request with Hannaford's legal office and the director of operations for the region. After gathering all the information and discussing the matter in a collaborative manner, Shute told store management that they should inform Morin that it is not a reasonable accommodation for him to leave by 2:30 p.m. every day because it would place an undue burden on the department.

On January 6, 2016, Davis and Moryan met with Morin to discuss his request to modify his schedule. At this meeting, Morin explained that he wanted to continue to work a full-time schedule but not work past 2:30 p.m. Davis explained to Morin that Hannaford was denying his accommodation request at least in part because there was a "standard" schedule for his position that required him to work until 7 p.m. once per week and she did not want to "set precedent" by deviating from the standard schedule. (Pl.'s Am. Add'l Statement of Material Facts (ECF No. 46) ¶ 39; Def.'s Reply to Pl.'s Am. Add'l Statement of Material Facts (ECF No. 49) ¶ 39.) Davis offered several part-time positions that would allow Morin to stop working at 2:30 p.m. but which would have resulted in a reduction in pay and benefits. Morin responded that he had been working a schedule for the past five years that was basically the schedule he was now requesting, and that he did not understand why Hannaford would not let him work the requested schedule given his medical need. Finally, Davis told Morin that he could call Shute if he had any questions.

On January 9, 2016, Morin spoke again with Moryan about Hannaford's denial of his schedule request and reiterated that he did not understand why Hannaford was denying him this schedule when it was basically the schedule he had been working. On January 13, 2016, Morin submitted a note to Moryan asking Hannaford to reconsider its decision. In the note, Morin stated, among other things, that he found it difficult to manage his Lyme disease symptoms while working the schedule that Hannaford was requiring.

In a letter dated January 15, 2016, from Store Manager Rob Meader to Dr. Dubocq, Meader wrote that he understood Morin was requesting the accommodation of staying in his current position and finishing work by 2:30 p.m. every day, but that Hannaford could only meet this accommodation in a different position. Meader further wrote that Hannaford could permit Morin to work 9 a.m. to 7 p.m. on a consistent basis in his current position and asked Dr. Dubocq if that

schedule would allow Morin to manage his symptoms. On January 21, 2016, Dr. Dubocq responded in a letter to Meader that he was not asking for Morin to be assigned to a different position but rather was requesting that Morin remain in his current position with a modified schedule. Dr. Dubocq further wrote, "Morin <u>cannot</u> work between the hours of 9 am-7 pm on a consistent basis at this time. A schedule that allows him to leave work by 2:30 pm would allow meeting his needs." (ECF No. 32, PageID # 562.)

On January 28, 2016, after conferring with Shute, Moryan spoke to Dr. Dubocq on the phone. Dr. Dubocq told Moryan, among other things, that Morin's health is good in the morning but in the late afternoon he "runs out of gas" and may "crash/retro-grade." (ECF No. 33, PageID # 650.) Dr. Dubocq further told Moryan that Morin would be fine if he could stop working every day between 2:30 and 3:30 p.m. Moryan subsequently emailed Shute with a summary of her January 28 conversation with Dr. Dubocq.

On February 4, 2016, Davis and Moryan met again with Morin to discuss his requested schedule and Davis again told Morin that Hannaford was denying his request. Davis gave Morin the choice of keeping his current schedule, resigning from Hannaford, or taking a part-time position at another store. The part-time position of up to twenty-eight hours per week would not have guaranteed Morin any hours, would have paid less than his current position, and offered fewer employee benefits. Davis initially told Morin that she needed his response by February 6, 2016, but Morin was later allowed to take two weeks of vacation to consider his options.

On February 17, 2016, Morin gave a note to Moryan stating, in relevant part, the following:

> I am requesting reduced schedule FMLA leave from my Assistant Meat Manager position for the next 8 months beginning immediately. I am in need of the reduced schedule FMLA leave because of my fatigue related disability. My current schedule asks for me to work til 4:30 pm one or two days per week and until 7 pm one day per week. This new schedule makes my symptoms worse. My doctor had

told me to work a schedule that ends by 2:30 pm. I will work with my doctor to discuss if the reduced schedule is still necessary during the next 8 months.

I still believe that you are able to provide me with a schedule adjustment as a reasonable accommodation for my disability. I don't believe that [a] request for shifts that end by 2:30 pm is unreasonable or unworkable or places an undue hardship on Hannaford. The only alternatives you offered me were to resign, transfer to a part time job with no guaranteed hours or benefits, or getting my doctor to remove his recommendation for my schedule restriction. I am very disappointed that my request was denied.

Please place me back on the schedule in my current role as Assistant Meat Manager and provide me the necessary forms to request reduced schedule FMLA.

(ECF No. 32, PageID # 568.) On the same day she received it, Moryan faxed Morin's note to Shute. Shute understood that Morin was asking for reduced schedule leave under the FMLA that would allow him to finish work at 2:30 p.m. Shute told Moryan that she would contact the legal department about Morin's FMLA request and instructed Moryan to do nothing until she heard back from Shute. Shute had previously received FMLA training, knew that intermittent leave differs from reduced schedule leave, and understood that reduced schedule leave means that the employee works a consistently reduced schedule.

On February 19, 2016, Shute informed Davis and Moryan that a request for intermittent FMLA leave for Morin should be entered in Hannaford's system. Hannaford assigned Morin's FMLA request to Lisa Cote, who was a Supervisor in the Leave of Absence Administration at Delhaize America (Hannaford's parent company). Cote had received FMLA training and also knew the difference between intermittent and reduced schedule leave. Specifically, Cote understood that intermittent leave occurs at a certain frequency and for a certain duration, while reduced schedule leave provides for a consistent reduction in an employee's work schedule.

On February 22, 2016, Hannaford sent Morin FMLA information and forms, including a form titled "Certification of Health Care Provider for Employee's Serious Health Condition

(Family and Medical Leave Act)," which the parties refer to as the "FMLA medical certification form." Hannaford subsequently received the completed form from Dr. Dubocq, dated March 17, 2016, in which he stated, in relevant part, that Morin suffers from severe fatigue and pain that "consistently escalate by mid-afternoon" and that "[w]hen this happens, he is more prone to work-related injury, as well as inability to perform his job duties." (ECF No. 32-1, PageID # 608.) Dr. Dubocq further stated that Morin "needs to be completing his daily shift by 2:30 pm" and that this would ensure that his "symptoms are averted, and he is thus able to perform all of his job duties." (Id., PageID # 608.) The FMLA medical certification form asked if Morin's medical condition would "cause episodic flare-ups periodically preventing the employee from performing [his] job functions." (Id., PageID # 609.) The form also asked for an estimate of the frequency and duration of any such flare-ups. A "flare-up" as that term was understood by Dr. Dubocq when he completed the form involves symptoms so severe that Morin has a hard time even getting out of bed; that is, Dr. Dubocq understood a "flare-up" to mean symptoms so severe that Morin cannot perform any work at all. Dr. Dubocq indicated on the form that he estimated Morin could experience one flare-up per week and that a flare-up would render Morin unable to work for an entire day.

On March 23, 2016, after she received information from Hannaford's legal department about a business Morin ran in his spare time, Cote sent Dr. Dubocq a letter enclosing information about the business and asking Dr. Dubocq if that information changed his medical opinion.[3] In the letter, Cote stated that she understood Morin to be claiming that he could not work past 2:30

---

[3] Specifically, Cote enclosed "a copy of a Facebook account for [Morin]'s personal meat cutting business" and asked Dr. Dubocq to note that the business's listed "hours of operation are from 3:00 pm-9:30 pm and that [Morin] offers to take in customers in the middle of the night." (ECF No. 32-1, PageID # 611.) Cote came to understand from Dr. Dubocq's response that Plaintiff's personal business is seasonal. (See Cote Dep. (ECF No. 28-6), PageID #s 306-07.)

p.m.  Dr. Dubocq responded by fax on April 7, 2016.  In his response, Dr. Dubocq reiterated that Morin "cannot safely work @ Hannaford on a consistent basis past 2:30 pm"; explained that "regarding his business operating after 2:30 pm, he employs 5 staff to do the work, so he has the ability not to work at all on 'bad days'"; and stated that the information provided by Cote did not change his opinion regarding the hours that Morin could work at Hannaford.  (ECF No. 32-1, PageID #s 612-13.)  In Cote's view, Dr. Dubocq's response addressed her concerns about Morin's side business.

On May 4, 2016, Cote sent Morin a letter stating that his "intermittent leave" request was approved.[4]  Cote's letter stated, in relevant part:

> Your intermittent leave . . . <u>for your Serious Health Condition</u> **is approved** for you to be out of work from time to time, from March 19, 2016 through March 19, 2017.
>
> Here's what this means to you[.]
> For your intermittent leave . . . you can take time off **1 time(s) per WEEK** and each time off can last **8 HOUR(s)**.

(ECF No. 32-1, PageID # 615.)  Cote claims that Hannaford never informed her that Morin requested reduced schedule leave and that she did not understand Dr. Dubocq's FMLA medical certification form to be requesting reduced schedule leave.  Hannaford in fact never provided Cote with Morin's February 17, 2016 note in which he requested "reduced schedule FMLA leave."

On May 6, 2016, Morin was called in to a meeting with Meader and Shute.  They presented him with a document titled "Record of Conversation," which Morin refused to sign.  The "Record of Conversation" stated, in relevant part, that: (1) Morin had applied for intermittent FMLA leave; (2) intermittent leave of one time per week for up to eight hours had been approved; (3) Morin

---

[4] On March 31, 2016, Hannaford sent Morin a letter denying his FMLA request based on a purported failure to provide a medical certification.  (ECF No. 32-1, PageID # 614.)  Morin was subsequently informed that this denial was in error, and the parties do not contend that this erroneous denial has any bearing on the issues currently before this Court.

"can use Intermittent FMLA when [he is] having a bad day"; (4) Morin would be expected to work his scheduled shift if he was not "having a bad day"; and (5) Morin's typical schedule was going to include "working one evening until 7:00 p.m., working until 4:30 one shift and until 3:00 the other rema[in]ing shifts." (ECF No. 33-2, PageID # 671.)

On August 29, 2016, Morin gave a note to Moryan stating, in relevant part, his view that Hannaford had treated his FMLA request as a request for intermittent leave when he had actually requested reduced schedule leave, and that his doctor had requested that Hannaford schedule Morin for shifts that end by 2:30 p.m. Morin stated that when he had worked past 2:30 p.m., he had needed co-workers to cut meat for him because he was too dizzy to do so himself. He also stated his belief that he was not allowed to leave work early more than one day per week, and that Hannaford had violated his rights under the FMLA. He again requested a schedule with shifts ending by 2:30 p.m. every day as a reasonable accommodation for his disability or reduced schedule leave so that he did not have to work past 2:30 p.m. on any day. Finally, Morin requested in his note that Moryan respond in writing by September 5, 2016. Moryan faxed Morin's note to Shute, but Hannaford did not respond to Morin's note in writing, and Morin's note was never given to Cote.[5] Morin did not provide Hannaford with any further medical documentation at this point.

On November 27, 2016, Morin emailed Moryan about his schedule, stating that working late shifts continued to be hard for him; that he was having to work when he was "run-down and dizzy"; and that he was worried working late was going to cause him to get hurt worse than just a "sore back or injured pinky toe." (ECF No. 41-8, PageID # 1071.) Morin also reiterated his request for a schedule adjustment, but Hannaford did not adjust his schedule. On February 7,

---

[5] Moryan claims that she advised Morin to call the leave office directly because his leave request was out of her hands in that it was being handled by the leave office. (Moryan Dep. (ECF No. 29-2), PageID # 366.)

2017, Morin filed a Complaint in this Court based on his contention that Hannaford had violated federal and state law in its handling of his schedule requests. (Compl. (ECF No. 1), PageID #s 20-21.)

At some point in 2017, Hannaford provided Morin with another FMLA medical certification form that Morin gave to Dr. Dubocq. On or about May 16, 2017, Dr. Dubocq submitted the completed form to Hannaford, which stated, in relevant part:

> [Morin's] main problem when it comes to his medical condition interfering with his work is that his fatigue and pain escalate through the course of the morning and peak by mid-afternoon. When this occurs he becomes less efficient and attentive. This in turn makes him more prone to work related injury (by cutting self on butcher knives!) and reduced ability to adequately perform his job duties. By allowing patient to leave work every day at 2:30 pm, these symptoms would be avoided resulting in improved safety and better job performance! (Along with better health of patient!)

(ECF No. 32-1, PageID # 622.)[6] Dr. Dubocq also stated that Morin "needs to finish work daily by 2:30 p.m. NO EXCEPTIONS!!" (Id., PageID # 623.) However, in the section of the form inquiring about the frequency of flare-ups, Dr. Dubocq again indicated that flare-ups may occur once a week for up to eight hours.[7]

In response to the 2017 FMLA medical certification, Cote sent Morin a letter using identical language from the prior 2016 FMLA authorization. That is, the letter states that Morin "can take time off **1 time(s) per WEEK** and each time off can last **8 HOUR(S)**." (ECF No. 32-1, PageID # 625.) This authorization covers the period from April 2017 through April 2018.

---

[6] The Court notes that although this note is nearly illegible, the parties do not dispute the content. (See Pl.'s Am. Add'l Statement of Material Facts (ECF No. 46) ¶ 100; Def.'s Reply to Pl.'s Am. Add'l Statement of Material Facts (ECF No. 49) ¶ 100.)

[7] The FMLA medical certification forms also suggest that Morin needs to take time off work with some frequency to see his doctor. (See ECF No. 32-1, PageID # 623.) However, the parties do not appear to address this aspect of Morin's medical need.

Hannaford never asked Morin to get a second medical opinion regarding his need for reduced schedule leave under the FMLA.

Based on Hannaford's tracking of his FMLA leave, Morin did not exhaust the twelve weeks of FMLA leave for which an employee is eligible between 2016 and 2017. Morin has remained the Assistant Meat Manager at the Elm Plaza store and received raises in 2016 and 2017.[8]

## III. DISCUSSION

Plaintiff has brought claims pursuant to the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §§ 4551-4634; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213; the Maine Whistleblowers' Protection Act ("WPA"), 26 M.R.S.A. §§ 831-840; the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654; and the Maine Family Medical Leave Requirements ("MFMLR"), 26 M.R.S.A. §§ 843-848. Defendant has moved for summary judgment as to all claims.

### A. ADA and MHRA Failure to Accommodate and Discrimination Claims

Plaintiff has brought claims for failure to accommodate under the MHRA and the ADA (Counts II & V), and unlawful discrimination under the MHRA and the ADA (Counts I & IV).[9]

---

[8] The Court has concluded that the material facts related to Morin's retaliation claims are genuinely disputed and therefore reserves its discussion of those facts to Section III.B.

[9] Because analysis under the ADA and the MHRA is the same for purposes of the issues raised by Plaintiff, the Court focuses its analysis on the ADA, construes the MHRA in a manner consistent with the ADA, and does not distinguish between the two statutes unless specifically noted. See Pouliot v. Town of Fairfield, 184 F. Supp. 2d 38, 51 (D. Me. 2002) (stating that the Court "will analyze the substance of Plaintiff's claims under ADA caselaw only; if Plaintiff succeeds in stating a claim under the ADA, he also states a claim under the disability discrimination provisions of the MHRA"); see also Fitzpatrick v. Town of Falmouth, 879 A.2d 21, 29 (Me. 2005) ("Because of the similarity between the MHRA and the [ADA], we utilize federal cases interpreting the ADA when we interpret comparable provisions in the MHRA.").

i.      Failure to Accommodate

Plaintiff contends that Defendant violated the ADA and the MHRA by failing to accommodate his request to work a modified schedule.  Under the ADA, an employer must make "reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee."  42 U.S.C. § 12112(b)(5)(A).  "Reasonable accommodations are modifications or adjustments to the work environment, or to the manner in which the position's duties are customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position."  Murray v. Warren Pumps, LLC, 821 F.3d 77, 84 (1st Cir. 2016) (citing 29 C.F.R. § 1630.2(o)).

"An employer is obligated to provide a reasonable accommodation (as long as it is not unduly burdensome) where a protected employee has requested an accommodation or the employer otherwise knew that one was needed."  Murray, 821 F.3d at 84.  A reasonable accommodation "is one which would enable [the employee] to perform the essential functions of her job [and] . . . at least on the face of things . . . is feasible for the employer under the circumstances."  Mulloy v. Acushnet Co., 460 F.3d 141, 148 (1st Cir. 2006) (quotation marks omitted); see also Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001) ("In order to prove 'reasonable accommodation,' a plaintiff needs to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances.") (footnote omitted).  Therefore, an employer violates the ADA if it fails to provide a reasonable accommodation unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business."  42 U.S.C. § 12112(b)(5)(A).  Reasonable accommodations "may include job restructuring [and] part-time or modified work schedules.

However, the ADA does not require an employer to reallocate job duties in order to change the essential function of a job." <u>Soto-Ocasio v. Fed. Express Corp.</u>, 150 F.3d 14, 20 (1st Cir. 1998) (citation and quotation marks omitted).

To succeed on a failure to accommodate claim under the ADA, then, "a plaintiff must show that: (1) he is a [disabled] person within the meaning of the Act; (2) he is nonetheless qualified to perform the essential functions of the job (with or without reasonable accommodation); and (3) the employer knew of the disability but declined to reasonably accommodate it upon request." <u>Sepúlveda-Vargas v. Caribbean Restaurants, LLC</u>, 888 F.3d 549, 553 (1st Cir. 2018). "[W]hile the employer bears the burden of showing that a fought-over job function is essential, the employee bears the burden of showing that she could perform that function, even if only with some reasonable accommodation for her disability." <u>Lang v. Wal-Mart Stores E., L.P.</u>, 813 F.3d 447, 454 (1st Cir. 2016) (citations omitted).

Plaintiff requested a modified full-time schedule that would allow him to end work by 2:30 p.m. every day as a reasonable accommodation (hereinafter, "Plaintiff's requested schedule"). Defendant contends that in order to perform his job Plaintiff must work until 7 p.m. one day per week and until around 4 or 5 p.m. on at least two additional days per week when the Meat Department Manager is off (hereinafter, for ease of reference only, the "standard schedule"). (<u>See</u> Def.'s Statement of Material Facts (ECF No. 39) ¶¶ 15, 28.) This Court, then, must consider whether adherence to the standard schedule is an essential job function of the Assistant Meat Manager position.[10] <u>See</u> <u>Laurin v. Providence Hosp.</u>, 150 F.3d 52, 56 (1st Cir. 1998) ("It is well

---

[10] To determine whether Defendant is entitled to summary judgment on Plaintiff's failure to accommodate claims, it is necessary to identify what essential job functions are at issue. <u>See</u> <u>Richardson v. Friendly Ice Cream Corp.</u>, 594 F.3d 69, 75 (1st Cir. 2010) ("To determine whether [an employee is] able to perform the essential functions of her position, it is necessary to identify those functions. Precision is critical, as the level of generality at which the essential functions are defined can be outcome determinative."). The Court recognizes that analysis of Plaintiff's failure to accommodate claims could proceed in one of two ways. On the one hand, the Court could consider various uncontested essential job functions of the Assistant Meat Manager position, such as role modeling customer service,

16

settled that an employer need not accommodate a disability by foregoing an 'essential function' of the employment position.").

The First Circuit has concisely outlined how a court assesses what is an "essential function":

> An essential function is one that is fundamental to a position. The term does not include marginal tasks, but may encompass individual or idiosyncratic characteristics of the job. Unsurprisingly, we have explained that the complex question of what constitutes an essential job function involves fact-sensitive considerations and must be determined on a case-by-case basis. In making this case-by-case determination, the ADA instructs us to give consideration to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job. And the Equal Employment Opportunity Commission's . . . implementing regulations of the Act further tell us that beyond the employer's judgment, things to be considered include (but are not limited to) factors like "[t]he consequences of not requiring the incumbent to perform the function[,]" "[t]he work experience of past incumbents in the job[,]" and "[t]he current work experience of incumbents in similar jobs." 29 C.F.R. §1630.2(n)(3). Such considerations are not meant to enable courts to second-guess legitimate business judgments, but, rather, to ensure that an employer's asserted requirements are solidly anchored in the realities of the workplace, not constructed out of whole cloth.

---

employee supervision, and directing work flow (see Def.'s Statement of Material Facts (ECF No. 39) ¶¶ 10-11; Pl.'s Am. Opp'n to Def.'s Statement of Material Facts (ECF No. 46) ¶¶ 10-11), as the relevant essential job functions and consider whether allowing Plaintiff to finish work by 2:30 p.m. every day is a reasonable accommodation in light of those essential functions. On the other hand, the Court could consider whether adherence to the "standard schedule" is the relevant essential job function.

On this record, the Court determines that it is appropriate to treat adherence to the standard schedule as the relevant essential job function for purposes of deciding Defendant's Motion. This approach cuts more efficiently to the heart of the dispute; if adherence to the standard schedule is an essential job function, it follows that Plaintiff is not qualified to perform the essential functions of his job with the modified schedule he seeks. Furthermore, this approach is consistent with the First Circuit's approach in schedule modification cases. See Sepúlveda-Vargas v. Caribbean Restaurants, LLC, 888 F.3d 549, 553-54 (1st Cir. 2018) (analyzing whether the ability to work rotating shifts as opposed to a fixed schedule is an essential function of a fast food assistant manager position). Regardless, the Court's ultimate conclusion on the failure to accommodate claims would not be different if the Court took the approach of assessing whether Plaintiff's requested schedule is a reasonable accommodation that allows him to perform essential job functions such as role modeling customer service, employee supervision, and directing work flow. See infra note 13.

Sepúlveda-Vargas, 888 F.3d at 553 (citations and quotation marks omitted); see also Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000) (stating that "individual or idiosyncratic characteristics" of a job constituting an essential job function may include "scheduling flexibility") (quotation marks omitted).

An employer's view of what is an essential job function is entitled to "substantial weight . . . in the absence of evidence of discriminatory animus." Ward, 209 F.3d at 34. However, the employer's view is ultimately "only one factor in the analysis" and is not dispositive. Id. In considering the job functions an employer contends are essential, a court "should take care to ensure that such functions are *essential in fact*." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 27 (1st Cir. 2002) (emphasis added). That is, a court must ensure that "an employer's asserted requirements are solidly anchored in the realities of the workplace." Sepúlveda-Vargas, 888 F.3d at 553 (quotation marks omitted).

After carefully reviewing the record, considering the relevant factors, and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that there is a genuine issue of material fact as to whether adhering to the standard schedule is an essential job function of the Assistant Meat Manager position. The Court acknowledges there is some undisputed evidence supporting Defendant's position. Defendant has consistently stated its view that working a schedule consistent with the Retail Leadership Schedule is an essential job function and has communicated this to people other than Plaintiff, including the Meat Department Managers Knowlton and Hustus. In other words, it does not appear that Defendant's application of the Retail Leadership Schedule to Plaintiff is pretextual or motivated by animus. However, the record reveals genuine factual disputes as to whether requiring the Assistant Meat Manager's adherence to the

standard schedule is in fact "solidly anchored in the realities of the workplace." Sepúlveda-Vargas, 888 F.3d at 553 (quotation marks omitted).

Defendant's rationales for adherence to the standard schedule are genuinely contested. Specifically, a reasonable factfinder could conclude that adherence to the standard schedule is not an essential job function based on the lack of any schedule requirements in the position description; evidence that Plaintiff and the department were functioning well during the years that Plaintiff was not adhering to the standard schedule;[11] and the inability of Defendant's managers to articulate consistent reasons for applying the Retail Leadership Schedule to the Assistant Meat Manager position or to consistently and plausibly connect Plaintiff's prior failure to follow the standard schedule with any perceived issues in the department (see Davis Dep. (ECF No. 28-4), PageID #s 243-44, 253-55, 257-59, 261; Meader Dep. (ECF No. 28-3), PageID #s 207-11, 213-14, 218-19, 221-23, 227-29; Hustus Dep. (ECF No. 28-5), PageID #s 282-84; Shute Dep. (ECF No. 28-2), PageID #s 178-79, 181-88, 190). Further, to the extent Defendant suggests that it is an essential job function of the position to work during "peak business hours," what constitutes "peak business hours" and how the concept relates to the Assistant Meat Manager position is also contested. (See Def.'s Statement of Material Facts ¶¶ 12-13; Plaintiff's Am. Opp'n to Def.'s Statement of Material Facts ¶¶ 12-13.)

Finally, the extent to which Morin's requested schedule would affect his ability to role model customer service, supervise employees, direct work flow, or perform other undisputed duties of his position is contested. In particular, a reasonable factfinder could conclude that Plaintiff's requested schedule would not affect his ability to perform other aspects of his job given

---

[11] The Court does not consider Plaintiff's prior schedule to be the type of "special arrangement" that should be excluded from the essential job function analysis. See Phelps v. Optima Health, Inc., 251 F.3d 21, 25-26 (1st Cir. 2001).

the evidence (1) that Plaintiff met Defendant's job-related expectations during the period that he was substantially working his requested schedule; (2) that the meat department met Defendant's performance expectations during that period; and (3) that any concerns on the part of management about the performance of the meat department during that period were not, in fact, connected to Plaintiff's schedule. Defendant's concern about "setting precedent" by providing Plaintiff with a modified schedule carries little weight in light of the fact that a reasonable accommodation is by its very nature a change in the status quo.

Defendant's arguments in support of summary judgment are off the mark. The axiom that "attendance is an essential function of any job" is inapposite because it applies to an employee's efforts to maintain employment without being present in the workplace, rather than an employee's efforts to modify his work schedule.[12] See Ríos-Jiménez v. Principi, 520 F.3d 31, 42 (1st Cir. 2008) (citing cases standing for the proposition that an employee who is completely absent from the workplace cannot be said to be performing the essential functions of the job). This matter is also distinguishable from those cases in which an employee sought to have his job duties reallocated to co-workers. See Feliciano v. State of R.I., 160 F.3d 780, 785 (1st Cir. 1998) ("The ADA does not require an employer to accommodate a disability by . . . reallocating essential functions to make other workers' jobs more onerous."). A reasonable factfinder could conclude that Plaintiff's requested schedule does not rely on reallocation of his duties because there are other employees, namely the Department Manager and, when the Department Manager is absent, the Service Leader, who are already performing duplicative managerial duties. (See, e.g., Pl.'s Am.

---

[12] Of course, Plaintiff literally could not perform *any* job function after 2:30 p.m. if he stopped working at that time. However, the Court does not understand Defendant to be arguing this interpretation of the essential job function analysis. Further, Defendant cannot convincingly argue that it is an essential function of the Assistant Meat Manager position to be present whenever any customer or supervised employee is present in the Elm Plaza store given that the store is open until 10 p.m., several hours later than Plaintiff's latest shift under the standard schedule. (See Davis Dep. (ECF No. 28-4), PageID # 247.)

Opp'n to Def.'s Statement of Material Facts ¶ 17.)  A reasonable factfinder could similarly conclude that Plaintiff is seeking to perform his same duties during different hours rather than passing them off to his co-workers.  The Court also is not swayed by Defendant's citation to cases in which courts have determined that adherence to a specific schedule was an essential job function.  (See Def.'s Mot. for Summ. J. (ECF No. 38), PageID #s 902-03.)  The essential job function inquiry is fact intensive and case specific; on the record before it, this Court can only conclude that whether the standard schedule is an essential job function is genuinely disputed.  See Sepúlveda-Vargas, 888 F.3d at 553 ("[T]he complex question of what constitutes an essential job function involves fact-sensitive considerations and must be determined on a case-by-case basis.") (quotation marks omitted).

The Court also notes that Sepúlveda-Vargas v. Caribbean Restaurants, LLC, which was decided after briefing on Defendant's Motion was completed, is distinguishable.  In that case, the First Circuit agreed with the district court that adherence to a specific type of schedule was an essential job function for an assistant manager at a fast food business.  Sepúlveda-Vargas, 888 F.3d at 553-54.  However, in reaching that conclusion, the Circuit emphasized (1) that the schedule requirement was delineated in the job application and listing, and (2) that it was uncontested that the employee's adherence to a different schedule would burden his co-workers.  Id. at 554.  In this case, the standard schedule is not in the position description or the official list of essential job functions and it is contested whether Plaintiff's requested schedule will burden his co-workers.  Further, it does not appear that the factors undermining Defendant's contention that adherence to the standard schedule is an essential job function, as outlined above, were present in Sepúlveda-Vargas.

Finally, the Court is not convinced by Defendant's contention that its provision of FMLA leave constituted a reasonable accommodation.  Putting aside the issues with the nature of the FMLA leave, <u>see</u> infra Section III.C, the Court is skeptical that FMLA leave, on its own, constitutes a reasonable accommodation in situations like that presented in this case.  The regulations make clear that a disabled individual is separately entitled to *both* reasonable accommodations *and* FMLA leave because the ADA and the FMLA provide distinct entitlements with distinct eligibility factors.  <u>See</u> 29 C.F.R. § 825.702(b).  In this case, the distinction between FMLA leave and ADA reasonable accommodation is patently clear.  Plaintiff sought an accommodation that would allow him to *work a modified, full-time schedule*.  After he was denied this option, he requested FMLA leave that would entitle him to *unpaid leave*.  Providing an employee with unpaid leave is simply not equivalent to providing him with a modified, full-time schedule as an accommodation.

As the Fifth Circuit recently explained,

> [A] request for FMLA leave is not a request for a reasonable accommodation under the ADA.  The ADA and the FMLA have divergent aims, operate in different ways, and offer disparate relief.  FMLA leave is not a reasonable accommodation under the ADA; rather it is a right enforceable under a separate statutory provision. . . . An employee who requests FMLA leave asserts he has a serious health condition that makes the employee unable to perform the functions of the position of such employee.  A request for a reasonable accommodation under the ADA is a claim that the employee, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.  Thus, an employee seeking FMLA leave is by nature arguing that he *cannot* perform the functions of the job, while an employee requesting a reasonable accommodation communicates that he *can* perform the essential functions of the job.

<u>Acker v. Gen. Motors, L.L.C.</u>, 853 F.3d 784, 791-92 (5th Cir. 2017) (citations and quotation marks omitted).  The cases cited by Defendant are all readily distinguishable.  At best, these cases endorse the proposition that *unpaid leave provided as a reasonable accommodation* may count

against an employee's entitlement to FMLA leave or be considered both as FMLA leave and an ADA reasonable accommodation for purposes of determining an employee's rights under both statutes.  See Capps v. Mondelez Glob., LLC, 847 F.3d 144, 156-57 (3d Cir. 2017); Scruggs v. Pulaski Cty., Ark., 817 F.3d 1087, 1093 (8th Cir. 2016); Murray v. AT&T Mobility LLC, 374 Fed. App'x 667, 671 (7th Cir. 2010); Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 967 (10th Cir. 2002); see also 29 C.F.R. § 825.702(c)(2).  These cases do not support the proposition that an employee who requests and is entitled to a modified full-time work schedule under the ADA can be reasonably accommodated by being provided unpaid leave to which he is otherwise entitled under the FMLA.  Regardless, even if Defendant is correct that its provision of FMLA leave could constitute a reasonable accommodation within the meaning of the ADA, there remain genuine issues of material fact surrounding the FMLA leave offered to Morin that preclude summary judgment on this basis.  See infra Section III.C.

For these reasons, Defendant's Motion is DENIED as to Plaintiff's failure to accommodate claims under the MHRA and the ADA (Counts II & V).[13]

ii.    Discrimination

Turning briefly to Plaintiff's discrimination claims, Plaintiff also contends that Defendant discriminated against him within the meaning of the ADA and the MHRA by refusing to provide him with his requested schedule.  The "ADA's definition of discrimination includes 'not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability . . . unless [the] covered entity can demonstrate that the accommodation

---

[13] If the Court considered undisputed essential functions of the position such as supervising employees and directing work flow to be the essential job functions at issue, the Court would still conclude that Defendant is not entitled to summary judgment on the failure to accommodate claims.  There are simply too many genuinely disputed factual issues concerning the realities of the Assistant Meat Manager position and its constituent duties for the Court to conclude on the record before it that Plaintiff's requested schedule was not a facially reasonable accommodation or that it would present an undue hardship for Defendant.

would impose an undue hardship on the operation of the [entity's] business.'" Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 125 n.2 (1st Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)); see also Carnicella v. Mercy Hosp., 168 A.3d 768, 772-73 (Me. 2017) (stating that the failure to provide a reasonable accommodation to a qualified individual is a form of discrimination under the MHRA). Assuming that Plaintiff's "discrimination" claims are conceptually distinct from the failure to accommodate claims, the discrimination claims rely on the same material factual issues as the failure to accommodate claims, namely, whether Plaintiff is qualified to perform his job with the accommodation of his requested schedule. Thus, for the same reasons the Court denies summary judgment on the failure to accommodate claims, the Court DENIES Defendant's Motion as to Plaintiff's discrimination claims under the MHRA and the ADA (Counts I & IV).

## B. ADA, MHRA, WPA, FMLA, and MFMLR Retaliation Claims

Plaintiff contends that he was unlawfully retaliated against for exercising his rights under the ADA, the MHRA, the WPA, the FMLA, and the MFMLR.[14] Specifically, he contends that Defendant retaliated against him by "[1] not calling him to work extra shifts or cover for absent employees and [2] forbidding him from starting work early," that is, forbidding him from

---

[14] Although Plaintiff did not bring specific FMLA or MFMLR "retaliation" claims, for purposes of this Order the Court determines, favorably to Plaintiff, that such claims are encompassed in Counts VIII and IX, which state that "Hannaford violated Morin's prescriptive and proscriptive rights under the" FMLA and the MFMLR, respectively. (Compl. (ECF No. 1), PageID # 21.) The Court applies the same analysis to the FMLA and the MFMLR claims and does not otherwise differentiate between the two statutes. See Brunelle v. Cytec Plastics, Inc., 225 F. Supp. 2d 67, 76 (D. Me. 2002) (treating the "FMLA analysis as dispositive of the merits of the MFMLR claims"). On the other hand, Plaintiff did bring a "WPA Unlawful Retaliation" claim, but the MHRA provides the right of action for persons claiming that they have been retaliated against based on whistleblowing activity. See Costain v. Sunbury Primary Care, P.A., 954 A.2d 1051, 1053 (Me. 2008).

"punching in" before the scheduled start of his shifts.[15]  (Pl.'s Resp. to Def.'s Mot. for Summ. J. (ECF No. 42), PageID #s 1091-92.)

Regarding the allegations concerning shift coverage, Plaintiff specifically contends that, despite requesting to be called in to cover shifts, on four to six occasions in 2016 he was not called in to cover shifts when the meat department was short-staffed.[16]  (Morin Oct. Dep. (ECF No. 37), PageID #s 854, 861.)  Plaintiff appears to contend that on all these occasions he was not called in by Hustus, but that on other occasions other employees in the meat department would call him in when Hustus was not present.[17]  (Morin Oct. Dep., PageID # 861.)

Regarding the allegations concerning punching in early, Plaintiff states that "once I received the FMLA [leave], all of a sudden they put a stop to us punching in early which was actually encouraged before that."  (Morin Oct. Dep., PageID # 852.)  He contends that store management "stated that they put a stop to [punching in early] within the department. . . . But it was, in fact, only me."  (Id.)  He further contends that he was written up twice for punching in early when others were not written up for doing the same.  (Id.)

It is undisputed that Hustus spoke with Plaintiff on December 21, 2015, and had him sign the Hannaford "Time Clock – Punch Accuracy" policy, which states, "[i]t is important that you

---

[15] Plaintiff is no longer contending that Defendant retaliated against him in other ways.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. (ECF No. 42), PageID # 1092.)  The Court understands this to mean in part that Plaintiff is not contending that Defendant retaliated against him by denying his request for a reasonable accommodation or by not providing the FMLA leave he requested.

[16] Plaintiff stated at his deposition that he was not called in to cover shifts "[p]robably four or five times."  (Morin Oct. Dep. (ECF No. 37), PageID # 861.)  However, he also appeared separately to recall an additional time that he was not called in for a shift.  (Id., PageID # 862.)

[17] Plaintiff contends that he "got in trouble" when he was called in to cover shifts by employees other than Hustus.  (Morin Oct. Dep., PageID # 861.)  This assertion is fatally underdeveloped, and, in any event, the Court doubts that the alleged disciplinary action cryptically alluded to by Plaintiff at his deposition would constitute an adverse action supporting a retaliation claim.

punch the time clock in and out as close to your assigned shift as possible."[18]  (ECF No. 34-1, PageID # 748.)  This was the day after Plaintiff first spoke to Moryan about his desire to work earlier shifts due to his medical condition.  Hustus asserts that he would tell and has told anyone who punches in early that they cannot do so, but that he is only aware of Plaintiff and Oscar Paradis, a meat cutter, punching in early.  (Hustus Dep., PageID #s 294-95.)   Hustus also asserts that Dan Breton, the Service Leader in the meat department, does not punch in early.  (Id., PageID # 295.)  However, Breton has stated that he is not aware of the policy against punching in early; that he punches in early; that he knows of others who punch in early; and that he has never been told by a manager not to punch in early without manager approval.  (Breton Dep. (ECF No. 29-1), PageID # 347.)

Plaintiff's retaliation claims all require him to establish (1) that he was engaged in protected activity, i.e., availed himself of rights under the relevant statutes; (2) that he suffered a materially adverse action or was adversely affected; and (3) that there was a causal connection between the protected activity and the adverse action.  See Sepúlveda-Vargas, 888 F.3d at 555 (ADA); Chase v. U.S. Postal Serv., 843 F.3d 553, 558 (1st Cir. 2016) (FMLA); Fuhrmann v. Staples Office Superstore E., Inc., 58 A.3d 1083, 1090 (Me. 2012) (MHRA and WPA).  At least for purposes of the federal law retaliation claims, a "materially adverse action" is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Sepúlveda-Vargas, 888 F.3d at 555 (quotation marks omitted).  If a plaintiff has made out a prima facie case of retaliation, a court applies the common McDonnell Douglas burden-shifting framework to determine whether any non-retaliatory reason for the adverse action offered by the employer is

---

[18] There is some dispute about the scope of the conversation on December 21, but this dispute is not relevant to the Court's analysis of the retaliation claims.

pretextual.[19]  See Richard v. Reg'l Sch. Unit 57, 296 F. Supp. 3d 274, 277 (D. Me. 2017), appeal

docketed, No. 17-2200 (1st Cir. Dec. 7, 2017) (collecting cases applying the McDonnell Douglas

burden-shifting analysis to retaliation claims under the ADA, the MHRA, and the WPA); Hodgens

v. Gen. Dynamics Corp., 144 F.3d 151, 160-61 (1st Cir. 1998) (stating that McDonnell Douglas

burden-shifting applies to FMLA retaliation claims).

Assuming favorably to Plaintiff that not being called in to cover shifts on four to six

occasions could constitute a "materially adverse action," Plaintiff has failed to make out a prima

facie case of retaliation regarding the shift coverage allegations.[20]  He has offered bald assertions

that he was not asked to cover shifts, but has not identified the dates of the shifts, explained why

he would have been otherwise entitled to cover those shifts, or identified the employees, if any,

who were called in to cover the shifts instead of him.  As the First Circuit recently reiterated,

"[w]here the plaintiff has the burden of proof, there must be evidence on which the [factfinder]

could reasonably find for the plaintiff. . . . [A] conglomeration of conclusory allegations,

improbable inferences, and unsupported speculation is insufficient to ward off summary

judgment."  Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 380-81 (1st Cir. 2018) (quotation marks

omitted).  Although Plaintiff states a belief that he has been passed over for certain unspecified

shifts, "[a] court need not take at face value a party's subjective beliefs, even if offered in the form

of testimony, if those subjective beliefs are conclusory, self-serving, and *lack factual support in

the record*."  Id. at 381 (emphasis added and quotation marks omitted).  Because "judges cannot

---

[19] To the extent the application of McDonnell Douglas burden-shifting to WPA retaliation claims is an open question, the bottom-line is that a Court must still consider "whether the record, construed in the light most favorable to [the non-moving party], suffice[s] to support an inference that the adverse employment action was motivated at least in part by protected activity."  Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 351 (1st Cir. 2018) (quotation marks omitted).  The Court's analysis of the retaliation claims is ultimately consistent with this approach.

[20] For purposes of the retaliation claims, the parties do not appear to contest that Plaintiff engaged in protected activity under the ADA, the MHRA, the WPA, the FMLA, and the MFMLR.

allow conjecture to substitute for the evidence necessary to survive summary judgment," <u>Pina v. Children's Place</u>, 740 F.3d 785, 802 (1st Cir. 2014), Defendant is entitled to summary judgment on Plaintiff's retaliation claims to the extent they arise from the shift coverage allegations.

Turning to the punching in early issue, the Court determines that Plaintiff's claims of retaliation under the ADA and the MHRA survive summary judgment. The Court readily determines that Plaintiff has made out a prima facie case. At the time Plaintiff was counseled by Hustus to adhere to the time clock policy, Plaintiff had already expressed a desire for a modified schedule based on medical necessity to Hannaford management. Stopping Plaintiff from clocking in early is a materially adverse action because it has the effect of reducing his pay and certainly could discourage a reasonable employee from pursuing his ADA or MHRA rights. <u>See</u> <u>Blackie v. State of Me.</u>, 75 F.3d 716, 725-26 (1st Cir. 1996); <u>Sepúlveda-Vargas</u>, 888 F.3d at 555. Finally, the causal connection element of the prima facie case is satisfied by the fact that Plaintiff was counseled by Hustus about punching in early a day after he spoke to Moryan about the possibility of a job accommodation. <u>See</u> <u>Collazo v. Bristol-Myers Squibb Mfg., Inc.</u>, 617 F.3d 39, 49-50 (1st Cir. 2010).

In response to Plaintiff's prima facie case, Defendant has offered a non-discriminatory rationale for its actions, that it was enforcing a general, pre-existing policy. This Court thus must consider whether there are triable issues of fact regarding whether this rationale is pretextual. Although it is a close call, the Court determines that there are indeed triable issues of fact. Specifically, although Hustus contends he was enforcing a general policy and that he spoke to any employee who punched in early, Breton stated that he was never made aware of the policy, that he would punch in early, and that other employees would punch in early as well. <u>See</u> <u>Smith v. Allen Health Sys., Inc.</u>, 302 F.3d 827, 835 (8th Cir. 2002) ("An employee can prove pretext by showing

the employer meted out more lenient treatment to similarly situated employees . . . who did not engage in protected activity.").  There may be a non-discriminatory reason for this discrepancy, and a factfinder could consider Hustus' contention that he also spoke to Paradis about punching in early, but sorting out these facts is not a task that can be accomplished on summary judgment.[21]

The Court determines, however, that Plaintiff has failed to make out a prima facie case of retaliation based on his availment of rights under the FMLA/MFMLR or based on whistleblowing activity.  Plaintiff was counseled regarding the time clock policy *before* he first asserted his rights under the FMLA in his note dated February 17, 2016.  For purposes of an FMLA retaliation claim, "an employer cannot be found to have retaliated against an employee for invoking his rights under the FMLA or taking FMLA leave unless the decisionmaker knew or should have known that the employee had invoked those rights."  Chase, 843 F.3d at 558.  At the time Hustus spoke with Plaintiff about the time clock policy, Plaintiff had only let store management know that he was interested in working earlier shifts, not that he was interested in taking any type of medical leave.  Plaintiff also alleges that he was disciplined two times in 2016 for punching in early, but he has not provided evidence that these incidents occurred after his first invocation of his FMLA rights on February 17, 2016.  Similarly, assuming most favorably to Plaintiff that the first instance of whistleblowing activity within the purview of the WPA was Morin's February 17, 2016 note,[22]

---

[21] The Court notes Hustus' deposition testimony when asked whether Breton punches in early that Breton "clocks in the other way."  (Hustus Dep. (ECF No. 28-5), PageID # 295.)  To the extent this ambiguous comment means that Breton punches out *after the end of his scheduled shift*, this could support an inference that employees are not being consistently held to Defendant's "Time Clock – Punch Accuracy" policy.

[22] The WPA describes several protected categories of whistleblowing activity, including, in relevant part, "report[ing] . . . to the employer . . . what the employee has reasonable cause to believe is a violation of a law or rule" and "report[ing] to the employer . . . what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual."  26 M.R.S.A. §§ 833(1)(A), (B).  The Court is not aware of any binding precedent that would treat Plaintiff's initial requests for a modified schedule as reports regarding a risk to "health or safety."

Plaintiff also has not provided evidence that any of the purportedly retaliatory events occurred after that protected activity.

For these reasons, the Court GRANTS Defendant's Motion as to Count VII (WPA Unlawful Retaliation); GRANTS Defendant's Motion as to Count VIII (FMLA) and Count IX (MFMLR) to the extent they raise retaliation claims; and GRANTS Defendant's Motion as to Count III (MHRA Unlawful Retaliation) and Count VI (ADA Unlawful Retaliation) to the extent those claims are premised on Defendant's purported failure to ask Plaintiff to cover shifts. The Court DENIES Defendant's Motion as to Count III and Count VI to the extent those claims are premised on Defendant's purported efforts to prevent Plaintiff from punching in early.

### C. FMLA and MFMLR Interference Claims

In relevant part, the FMLA entitles "an eligible employee . . . to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."[23]  29 U.S.C. § 2612(a)(1)(D).  Leave for a serious health condition "may be taken intermittently or on a reduced leave schedule when medically necessary."  Id. § 2612(b)(1).  "Intermittent leave is FMLA leave taken in separate blocks of time due to a single qualifying reason," whereas "[a] reduced leave schedule is a change in the employee's schedule for a period of time, normally from full-time to part-time."  29 C.F.R. § 825.202(a).  When a request for leave is based on the employee's own health condition, the employee may be required to submit a medical certification, or otherwise provide medical information, that supports the medical necessity for leave and estimates its

---

[23] For purposes of Plaintiff's FMLA and MFMLR claims, the Court again "treat[s] the MFMLR claims as coextensive with the FMLA claims," and does not distinguish between the statutes unless explicitly noted.  Brown v. Hartt Transp. Sys., Inc., 725 F. Supp. 2d 210, 229 (D. Me. 2010).  Neither party raises any issue with this approach.

frequency and duration.  <u>See</u> 29 U.S.C. § 2613(a)-(b); 29 C.F.R. § 825.306(a)(7).  If the employer

doubts the validity of the medical need asserted, it may require the employee to obtain a second,

or even third, medical opinion.  29 C.F.R. § 825.307(b)-(c).  If the employer considers the medical

certification to be incomplete or insufficient—that is, "vague, ambiguous, or non-responsive"—

the employer must provide notice to the employee of the deficiency and give the employee a certain

amount of time to correct it.  <u>Id.</u> § 825.305(c).

　　　In addition to defining an eligible employee's rights to certain leave, the FMLA also

proscribes employers from interfering with an employee's exercise of his rights under the FMLA.

29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny

the exercise of or the attempt to exercise, any right provided under this subchapter.").  To prevail

on an FMLA interference claim, the employee

> must establish five things.  First, the worker must establish that she fit the definition
> of an "eligible employee."  Second, the worker must establish that she worked for
> an employer covered by the Act.  Third, the worker has to show that she qualified
> for FMLA benefits for one of four statutory reasons.  Fourth, the worker has to
> prove that she gave her employer appropriate notice.  Finally, the worker has to
> establish that the employer denied her benefits to which the FMLA entitled her.

<u>Wheeler v. Pioneer Developmental Servs., Inc.</u>, 349 F. Supp. 2d 158, 164 (D. Mass. 2004)

(citations omitted).  In other words, the gravamen of an FMLA interference claim is that an

employer interfered with the employee's use of leave to which the employee was otherwise entitled

under the FMLA.  <u>See</u> <u>Carrero-Ojeda v. Autoridad de Energía Eléctrica</u>, 755 F.3d 711, 722 (1st

Cir. 2014) ("Unlike in a [FMLA] retaliation claim, no showing as to employer intent is required.

The key issue is simply whether the employer provided its employee the benefits to which she was

entitled per the FMLA.") (citation and quotation marks omitted).  Further, "[i]nterfering with the

exercise of FMLA rights 'would include, for example, not only refusing to authorize FMLA leave,

but discouraging an employee from using such leave.'" Hodgens, 144 F.3d at 160 n.4 (quoting 29 C.F.R. § 825.220(b)).

Defendant does not dispute Plaintiff's general entitlement to FMLA leave or contend that his request for reduced schedule leave would have exceeded his twelve weeks of leave under the FMLA. Rather, Defendant appears to contend that it did not interfere with Plaintiff's FMLA rights because it provided him with FMLA leave. On this record, however, the Court determines that there are triable issues of fact concerning whether Defendant interfered with Plaintiff's exercise of his rights under the FMLA by authorizing intermittent leave in the face of Plaintiff's request for reduced schedule leave.

At the outset, there is a crucial factual dispute concerning whether Plaintiff was in fact restricted to taking FMLA leave one day per week and would face repercussions under Defendant's attendance policies if he took leave more frequently. Plaintiff testified that he understood from the FMLA authorizations and from his conversations with management that he could only take leave one day per week. (See, e.g., Morin Aug. Dep. (ECF No. 28-1), PageID #s 166-68; Morin Oct. Dep., PageID # 848.) Further, Cote, who processed Plaintiff's leave request, testified that she understood the leave authorization to only allow Plaintiff to take FMLA leave one day per week. (See, e.g., Cote Dep. (ECF. No. 28-6), PageID #s 307-08, 310-11.) However, Shute appears to have testified that she told Plaintiff he could take FMLA leave as often as needed and advised store management that Plaintiff was allowed to take FMLA leave more than one day per week. (Shute Dep., PageID #s 195-96, 197-98.) If the factfinder determines that Plaintiff was in fact never told that he could take FMLA leave as often as needed, a reasonable factfinder could certainly look at the record and discern interference by Defendant with Plaintiff's attempt to take FMLA leave to which he was otherwise entitled. In this regard, the Court notes in particular the unexplained initial

classification of Plaintiff's explicit request for reduced schedule leave as a request for intermittent leave; the failure to provide Cote with Plaintiff's correspondence explicitly requesting reduced schedule leave; Cote's crabbed interpretation of Dr. Dubocq's medical authorization form; Cote's questionable assertion that she could not have determined Plaintiff's schedule in order to provide authorization for reduced schedule leave (Cote Dep., PageID # 310); and the failure to work with Plaintiff or Dr. Dubocq once it became evident that Plaintiff was not satisfied with the nature of the FMLA leave authorization.

The Court's conclusion that Plaintiff's FMLA and MFMLR claims are not ripe for summary judgment is grounded in the record rather than the arguments in Defendant's briefs. Defendant suggests in its briefs that Plaintiff was not entitled to anything beyond the intermittent leave he was provided. However, Cote testified that she crafted the FMLA authorization based on her understanding that Dr. Dubocq was requesting leave one day per week for Plaintiff's "flare-ups." (See, e.g., Cote Dep., PageID #s 307-08.) Neither Cote nor anyone else in Hannaford management clearly testified that they decided to partially reject Plaintiff's leave request based on his failure to demonstrate medical necessity for reduced schedule leave. The Court also notes in this regard that Defendant never asked Plaintiff for a second medical opinion or informed him that it considered the medical certification forms he submitted to be ambiguous or incomplete.[24]

---

[24] The Court is not swayed by Defendant's argument that certain hortatory language in the FMLA regulations means that an employer can deny medically necessary leave if it is unduly burdensome to the employer. See 29 C.F.R. § 825.302(f) ("The employee and employer shall attempt to work out a schedule for such leave that meets the employee's needs without unduly disrupting the employer's operations, subject to the approval of the health care provider."). Elsewhere in its briefing, Defendant admits that "FMLA leave is more favorable to employees [than the ADA] because they may take leave regardless of the hardship to the employer." (Def.'s Mot. for Summ. J. (ECF No. 38), PageID # 895 n.5.) The Court also does not consider it necessary to address the question of whether the FMLA allows for "prophylactic leave." However, to the extent Plaintiff's request could be construed as a request for such leave, the Court notes that the FMLA regulations specifically contemplate the taking of leave to prevent the manifestation or worsening of symptoms. See 29 C.F.R. § 825.115(f) ("[A]n employee with asthma may be unable to report for work due to the onset of an asthma attack *or because the employee's health care provider has advised the employee to stay home when the pollen count exceeds a certain level*.") (emphasis added).

To the extent Defendant is asking the Court to make its own assessment of Plaintiff's medical necessity for leave, the Court discerns no basis in the record for determining that the reduced schedule leave Plaintiff requested is not medically necessary. Further, contrary to Defendant's argument in its Reply, Plaintiff has consistently cited both the "flare-ups" and the more frequent worsening of symptoms in the afternoon that arises from his Lyme disease.[25] (See Compl. ¶¶ 21, 29-30, 39, 42, 60-62, 140.) Finally, as Plaintiff notes, the case cited by Defendant for the proposition that an employer can choose the type of FMLA leave it authorizes regardless of the nature of the employee's request is inapposite because that case involved an employee who was unable to perform the essential functions of her job during the time that she wanted to come in to work. See Scruggs, 817 F.3d at 1093-94.

For these reasons, the Court DENIES Defendant's Motion to as Count VIII (FMLA) and Count IX (MFMLR) to the extent they raise interference claims under those statutes.[26]

## IV.   CONCLUSION

For these reasons, the Court DENIES Defendant's Motion as to Plaintiff's MHRA discrimination claim (Count I); DENIES Defendant's Motion as to Plaintiff's MHRA failure to accommodate claim (Count II); GRANTS Defendant's Motion as to Plaintiff's MHRA retaliation claim (Count III) to the extent the claim is premised on Defendant's purported failure to ask

---

[25] Although Plaintiff has confirmed that he typically experiences "flare-ups" lasting up to a full day at most once per week (Morin Aug. Dep. (ECF No. 28-1), PageID # 162), he has also consistently stated that his symptoms manifest in the afternoon with greater frequency (see id., PageID #s 153-54).

[26] Plaintiff also argues that Defendant violated the ADA and the MHRA by interfering with his rights to FMLA and MFMLR leave. (See Pl.'s Resp. to Def.'s Mot. for Summ. J., PageID #s 1090-91.) The Court is skeptical of this argument in part because it would transform every FMLA discrimination or interference claim into an ADA claim. Further, the Court sees the ADA/MHRA and FMLA/MFMLR claims as legally distinct in this case. See supra Section III.A.

Plaintiff to cover shifts, but otherwise DENIES the Motion as to that Count; DENIES Defendant's Motion as to Plaintiff's ADA discrimination claim (Count IV); DENIES Defendant's Motion as to Plaintiff's ADA failure to accommodate claim (Count V); GRANTS Defendant's Motion as to Plaintiff's ADA retaliation claim (Count VI) to the extent the claim is premised on Defendant's purported failure to ask Plaintiff to cover shifts, but otherwise DENIES the Motion as to that Count; GRANTS Defendant's Motion as to Plaintiff's WPA retaliation claim (Count VII); GRANTS Defendant's Motion as to Plaintiff's FMLA claim (Count VIII) to the extent the Count is based on a retaliation theory, but DENIES the Motion to the extent the Count is based on an interference theory; and GRANTS Defendant's Motion as to Plaintiff's MFMLR claim (Count IX) to the extent the Count is based on a retaliation theory, but DENIES the Motion to the extent the Count is based on an interference theory.

In short, this matter shall be set for a bench trial of the following claims: Counts I, II, IV, V, as well as Counts III & VI to the extent these retaliation claims are premised on the Defendant's purported actions to stop Plaintiff from punching in early, and Counts VIII & IX to the extent these claims are based on Defendant's purported interference with Plaintiff's rights under the relevant statutes.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 7th day of June, 2018.